UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO

RUBEN SERRANO MOJICA, ET AL.,

     Plaintiffs

        v.

EL CONQUISTADOR RESORT AND GOLDEN DOOR
SPA,

     Defendant.

CIVIL NO. 08-1797 (PG)

## OPINION AND ORDER

    Plaintiff Ruben Serrano Mojica ("Plaintiff" or "Serrano"), a forty-five year-old hotel bartender brings this case against his employer, defendant El Conquistador Resort and Golden Door Spa ("Defendant" or "the Hotel") under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623.  Serrano also pleads supplemental state law claims for age discrimination and retaliation under Puerto Rico Act No. 100, P.R. LAWS ANN. tit. 29, § 146 ("Law 100") and Puerto Rico Act No. 115, P.R. LAWS ANN. tit. 29, § 194(a) ("Law 115").  Before the Court are the Hotel's Motion for Summary Judgment (Docket No. 47) and Serrano's Opposition thereto (Docket No. 57).  The Hotel subsequently filed a Reply (Docket No. 66) and Serrano a Surreply (Docket No. 78).

    This case raises important questions about how to surpass summary judgment with direct and circumstantial evidence of age discrimination in the aftermath of the Supreme Court's decision Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343 (2009), which in some aspects raised the standard for proving an ADEA claim. In essence, this case surrounds the working life of a career bartender with a complicated employment history consisting of many years of good service, followed by a deteriorating relationship with his supervisors that eventually

gave way to open hostilities, and that allegedly culminated in the bartender's psychological breakdown.  Because the facts are controverted, it is exceedingly difficult to pinpoint who is at fault, or who was the cause and what was the effect.  The Court, nevertheless, endeavors to sort out the factual versions of this highly contentious story, in order to evaluate the merits of Plaintiff's legal claims for purposes of summary judgment.  For the reasons that follow, the Court **DENIES** Defendant's Motion for Summary Judgment.

## I. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. FED. R. CIV. P. 56©; Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008).  A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. Prescott, 538 F.3d at 40 (citations omitted). "'A fact is material if it has the potential of determining the outcome of the litigation.'" Id. (quoting Maymi v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008)).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record through definite and competent evidence. See DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997); Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (internal citations omitted).  If the non-movant generates

uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing.  See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir. 2000).  While the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment," the Court may grant the motion if the non-moving party rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mgf. Corp, 331 F.3d 166, 173 (1st Cir. 2003)).  It is well-settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). This is so because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

Discrimination claims pivot on issues which are quintessential jury questions, like motive or intent; in rare cases, however, summary judgment may be appropriate in the discrimination context if the nonmoving party rest merely upon conclusory allegations, improbable inferences, and unsupported speculation. See Vesprini v. Shaw Industries, Inc., 221 F. Supp. 2d 44, 53 (D. Mass. 2002).

## II. Factual Background

The following factual narrative is derived from facts that are deemed uncontested by the Court because they were included in the Motion for Summary Judgment, Opposition, Reply, and Surreply, and were agreed upon, or were properly supported by the evidence and not genuinely opposed.  The facts are viewed in the light most favorable to Serrano, the nonmovant.

Serrano, born on January 15, 1965, was employed as a bartender at El Conquistador Hotel and Golden Door Spa on January 2, 1996, when he was thirty (30) years old.  He occupied this position until his termination on September 18, 2009, at which time he was forty four (44) years old.  Pursuant to the Hotel's job description, his essential duties included, among other things: (1) serving guests in a warm, friendly, courteous and professional manner; (2) approaching all encounters with guests and employees in a friendly, service-oriented manner; (3) complying at all times with the Hotel's standards and regulations to encourage safe and efficient Hotel operations; (4) following prescribed procedures in serving liquor with care to avoid problems with intoxicated guests.  Serrano's duties remained the same throughout his employment.  Upon his employment, Serrano was provided with a copy of the Hotel's rules and policies, of which he received updated versions numerous times throughout the years, and he was given two weeks of training.

Serrano worked at several bars in the Hotel, among these, Drake's Bar, Amigo's Bar, Bar 21, and Isabela's Restaurant.  The Hotel had a practice of rotating bartenders to different bars based on business necessity; it also had a practice of awarding yearly pay increases and merit-based promotions to its bartenders.  Serrano requested, in one instance, that he be transferred from Isabela's Restaurant to Amigo's Bar for personal reasons; the Hotel so agreed and Serrano continued to receive the same salary and benefits.

**A. Allegations of Age Discrimination and Retaliation**

For purposes of ADEA analysis, the Court treats Serrano's allegations of age discrimination with a narrowed focus on the period of time of his employment wherein he became a member of the statute's protected class, that is, when he turned forty (40): beginning on January 15, 2005, until his termination on September 18, 2009.  The Hotel affirmatively states that Serrano was assigned to work areas in the same manner as all other bartenders and was rotated to different bars depending on business necessity.  It adds that he was evaluated in the same manner as other similarly situated employees, and received yearly pay increases as well as merit-based promotions.  In effect, the Hotel defends all of its employment decisions as nondiscriminatory business practices and denies in large part Serrano's factual allegations of age discrimination.

Serrano, however, alleges that during the period of 2007-2009 he was: (1) relegated almost exclusively to a provisional bar in the Hotel's lobby (the "Lobby Bar") with limited equipment, reduced clientele, and tip-based income, while younger bartenders were assigned to more popular and profitable bars; (2) given reduced working hours (from 5 days and 40-hour weeks to 4 days and 28 to 30-hour weeks) while younger bartenders were given schedules in excess of 40 working hours per week; (3) denied a yearly pay increase in 2007 and 2009 as opposed to younger bartenders who did receive them; and (4) given a reduced pay increase of .23¢ in 2008 compared to younger bartenders who received .35-.37¢ salary increases the same year. (See Pl.'s Statement of Uncontested Material Facts ("SUMF") 1-3 & Ex. 1 ¶¶ 1-3.)   The details of Serrano's factual allegations of age discrimination, summarized above, are set forth as follows.

According to Serrano, he was transferred from Bar 21 to the Lobby Bar in September 2007, while Bar 21 was being remodeled, and remained there until approximately February 2008, even after the renovations were completed in November 2007.  The Lobby Bar was a temporary bar with less clientele and the

lowest sales of any bar at the Hotel; younger bartenders were assigned to more profitable bars such as Drakes Bar or Bar 21.  Serrano would earn $3.00 to $4.00 in tips at the Lobby Bar during an entire shift while younger bartenders at Bar 21 would earn $300.00 in daily tips.  After the Lobby Bar was closed in February 2008, Serrano was assigned to work at a service bar until his termination. According to the Hotel, however, Serrano was not relegated to the Lobby Bar or the service bar, countering that Serrano was one of two bartenders permanently assigned to Bar 21 due to seniority.

On October 20, 2007, Serrano was involved in an altercation with hotel guests, the facts of which are controverted, and was suspended for two days pending an investigation for possible termination.  Serrano's version of the story posits that several inebriated guests demanded drinks and attacked him, breaking a liquor bottle in the process, when he refused to serve them and as the supervisor on duty demanded that they be served.  When Serrano received a beating from the guests, the Hotel did not provide any security.  The guests and supervisors claim, on the other hand, that Serrano started the fight by breaking a bottle of whiskey in response to their heckling, injuring them with the broken shards and prompting the melee.

Serrano was given a final warning by letter summarizing a history of seven incidents of misconduct and warning that any future violation of the Hotel's rules and regulations would result in his dismissal. (Def.'s SUMF, Ex. 18.)  In his defense, Serrano states that the written reports were filed for "totally false and unjustified reasons" and that he was, in fact, deemed an excellent employee. (Pl.'s SUMF ¶ 11.)  Indeed, Serrano received positive evaluations and performance-based awards in 1998, 2002, and 2005. (See Pl.'s SUMF, Ex. 15.) Serrano received high marks and positive feedback in his 2007 annual written evaluation, appraised by his three supervisors at the time: Leonides Nieves, Madeleine Burgos, and Max Bonnemain. (See Def.'s SUMF, Ex. 24.)

After the altercation, Serrano was referred to the State Insurance Fund ("SIF") on November 15, 2007, and SIF placed him on leave for rest until January 28, 2008, when he eventually returned to work. While on medical leave, Serrano filed a charge with the Equal Employment Opportunity Commission (EEOC) on December 19, 2007, against the Hotel, alleging that his suspension for the October 20 incident had been for "false and discriminatory reasons" in violation of Title VII of the Civil Rights Act and the ADEA. On May 8, 2008, the EEOC issued him a right-to-sue letter in connection with his charge, as it was unable to conclude if the charge established a violation of the statutes. On July 22, 2008, Serrano filed the instant Complaint. Once Serrano was released from his treatment on January 28, 2008 and authorized to return to work, he was reinstated to his former position as bartender with the same duties, responsibilities, and benefits as before.

Serrano claims that after he filed his discrimination charge with the EEOC, the Hotel changed his working shift from one starting at 5:00 p.m. to one starting at 9:00 p.m. and later 10:00 p.m.. These late-night shifts would end at 2:00 and 3:00 a.m. respectively. For the previous eight or nine years, Serrano says that he consistently had Mondays and Sundays off, but that after he filed the discrimination charge, his supervisors repeatedly changed these days off from work.

According to Serrano, after the Lobby Bar was closed in late January 2008, he was assigned to work at the service bar, where he had to be moving and lifting heavy boxes weighing over sixty (60) pounds and also moving and cleaning floor mats weighing over (100) pounds. Serrano avers that he was assigned to the service bar when his supervisor was aware that he had a herniated disk condition for which he had received medical treatment at the SIF. A specialist on reasonable accommodations from the SIF supposedly informed the Hotel that Serrano could not be working under those conditions, but the Hotel purportedly

did not do anything about it.  Serrano then injured his back and had to request a leave from SIF to receive treatment for herniated discs.  Serrano states that he worked at the service bar from late January 2008 until his termination without rotation, even though it was the Hotel's practice to rotate bartenders on a weekly basis from the service bar due to the strenuous physical work required there.  At the service bar, Serrano says he could not directly serve hotel guests and was thus unable to receive tips, which drastically reduced his salary.

Throughout the period of 2007-2009, Serrano requested to be promoted to supervisory and managerial positions, but his supervisors Jose Fas and Max Bonnemain allegedly informed him that he would not be promoted because he was too old and wanted younger employees for those positions.  The Hotel, he says, promoted younger persons with less experience and seniority than him to supervisory positions.  The Hotel, in its defense, affirms that he never formally applied for a supervisory position.

Serrano's supervisors purportedly never provided him with the equipment that he needed and specifically requested, such as alcohol, food, napkins, and glasses.  When he did request such items, Fas would tell Angel Soto Velez ("Soto"), a bar runner or busboy, that he would not provide Serrano with anything because he was an old man and wished he would leave, referring to him as a "*viejo cabrón*" or "old asshole."[1]  (Pl.'s SUMF ¶ 34 & Ex. 6 at 22-23.)  On the contrary, Soto stated, the younger bartenders were provided with everything they needed.  When he was assigned to the Lobby Bar or the service bar, Serrano avers that he was the only bartender not allowed to take a fifteen minute break.

---

[1] Translation ours.  While there is no perfect translation of the Spanish word "*cabrón*" into English as used in this context, the Court provides the translation it deems most appropriate taking into consideration its implied connotations.  Hereinafter the Court will use the translated phrase.

According to Serrano, his supervisors, including Fas, Max, and Leonides Nieves, went further and made harassing and outwardly discriminatory comments to him on a regular basis.  Nieves would constantly call him names like "old man," "old maniac," "crazy," "bitter old man," and "old fusspot." (Pl.'s SUMF ¶ 34 & Ex. 2 at 101-104.)  Fas would tell him that if he did not like his treatment, then he could leave his job, and that the bartender position was not a job for old men.  Sonia Figueroa Sanchez, a waitress, stated in her deposition that Nieves would regularly call Serrano a "grouchy old man" and "grouchy menopausal old man," and that Fas also called him a "grouchy old man." (Pl.'s SUMF ¶ 34 & Ex. 3 at 33-37.)  Richard Fry Lopez, a coworker, also testified in his deposition that Fas made derogatory statements like "this old man has my life soured." (Pl.'s SUMF ¶ 34, Ex. 5 at 16.)  Soto added that Fas called Serrano an "old asshole" and that he said he was "crazy for that old man to leave." (Pl.'s Ex. 6 at 22-23.)  Soto stated that Serrano was harassed by his supervisors, particularly Nieves, to such an abusive degree that he felt compelled to intercede and was himself emotionally affected by the abuse. (Id. at 26-29.)  Luis Melendez Baez ("Melendez"), a housekeeper, stated in his deposition that he would sometimes offer Serrano a quick meal because he was not given any meal-breaks, but that Fas would tell him not to give any food to that "old guy" and that " old ass..." whenever he would see Melendez carrying take-out food to the bar. (Pl.'s SUMF ¶ 34 & Ex. 4 at 24-26.)

Serrano alleges that he complained to Luis Alvarez, the director of human resources, about his supervisors' discrimination, but that Alvarez only offered derogatory remarks.  Alvarez allegedly told him that he was putting himself through ridicule by complaining at his age; that he was a "damn disgrace" to the Hotel; that Serrano could go look for twenty lawyers but that if "I had the ball [sic] to kick you out from here, I'll kick you out." (Pl.'s SUMF, Ex. 2 at 107.) Serrano avers that, after his meeting with Alvarez, he tried to approach the

Civil No. 08-1797(PG)                                                   Page 10

general manager of the Hotel, Stan Soroca, with his complaints, but that Soroca did not want to meet with him and had stated that he wanted him fired.


**B. Serrano's Termination**


On April 25, 2009, Serrano and his new supervisor, Madeline Burgos, had an argument - the hostile nature of which is disputed by the parties - regarding his discontentment with his working hours.  Burgos reported the incident to the human resources department the next day.  On April 28, 2009, Serrano appeared for the taking of his deposition in the case at bar, in which Burgos was requested to appear on behalf of the Hotel.  During the deposition, another hostile encounter, of which the parties also offer conflicting versions, took place between Serrano and Burgos.  While the deposition transcript does not show the individuals' demeanor or tone, it does demonstrate that Serrano made troubling remarks on the record that he had thought of committing suicide and killing his former supervisor, Fas, for the emotional pain inflicted upon him by his discrimination and harassment. (See Def.'s SUMF, Ex. 4 at 274-75.)  In the testimony at issue, Serrano began by explaining that because of his suffering, he had to take prescription medication for muscle relaxation, insomnia, and depression.  Then, in an emotional outburst, he exclaimed:

> Never in my life had I . . . had a thought to commit suicide in my life.
> . . . Never in my life had I felt the anger to kill a person, and I was about to do so, I had it very planned.
>
> I'm telling you, I cry here because thank God I didn't do it, because I . . . what I felt was the desire to kill . . . Fas . . . and I planned it and I was going to do it, I was going to do it in the very hotel.  And I also planned hanging myself there, in that damn bar, in Bar 21 . . . there inside the Casino, in that pretty atrium . . . and I thought about it a lot, hanging myself from that, that bar. Because of all the hurt I went through. And you're going to ask me whether what harm they've done to me. Oh my God!

(Id.)

A day after the deposition, on April 29, another controverted hostile encounter took place between Serrano and Burgos.  Serrano alleges that when he arrived to work, Burgos proffered derogatory remarks and called him an "old asshole" and an "old coward." (Pl.'s SUMF ¶ 44-46 & Ex. 1 ¶ 19.)  She also allegedly threatened him with violence, with the help of her husband and Bonnemain, due to what he had said in his deposition.  The next day, when Serrano arrived to work, Bonnemain purportedly threatened Plaintiff, grabbing him by the arm forcefully and pushing him against the wall, and told him that he had to meet with Alvarez.  According to Serrano, at the meeting Alvarez yelled at him and told him he would be terminated because he was an "old asshole" and because of what he had said in the deposition.  The Hotel labels all of these allegations involving the hostilities between Serrano, Burgos, and his other supervisors, as well as the director of human resources, as false and defamatory.  That same day, Serrano was suspended for three days for insubordination in connection with the April 25 hostile encounter and for making threatening statements in the deposition.

On May 1, 2009, it came to the Hotel's attention that around 12:00 p.m. Serrano was taken by his brother to his psychiatrist, Dr. Jose Luis Lopez Marquez ("Dr. Lopez"), for urgent care.  Dr. Lopez referred Serrano to Dr. Reynaldo Rodriguez of San Juan Capestrano Hospital for emergency hospitalization due to severe depression and generalized anxiety, noting in his referral that he expressed murderous thoughts toward his supervisor.  Serrano's psychiatric evaluations display a history of mental instability dating from February 19, 2008, in which he had also displayed murderous thoughts toward three supervisors triggered by Serrano's work-related problems and his feelings of discrimination, whether or not such feelings were justified or grounded in truth. (See Def.'s SUMF, Ex. 9.)

Dr. Lopez was deposed on June 9, 2009.  Dr. Lopez testified that  on May 1, at the moment Serrano appeared at his office in a distressed state, he took his violent threats seriously, did not anticipate an absolute improvement, and believed him to present a risk to other persons. (See Def.'s SUMF, Ex. 28 at 73, 85-88.)  However, Dr. Lopez also testified that Serrano was going through a "period of unstableness" and that, as of the date of the deposition on June 9, he could return to his work area; he stated it would not be good for his emotional well-being to remain at the Hotel and recommended looking for a job elsewhere. (Id.)  On June 22, 2009, Dr. Lopez issued a certification of medical condition directed to the Hotel's human resources department informing the Hotel that Serrano had been discharged of the partial hospitalization, that he received psychotherapy and pharmacotherapy treatment, and that he was considered stable. (See Pl.'s SUMF, Ex. 9.)  Dr. Lopez's certification stated that as of June 22, Serrano did not "present any type of dangerousness to his family, community, or work area[,]" that he had achieved "good psychological, mental, and emotional well-being[,]" and that "because of this reason, it is recommended that he be returned to his work duties, effective on Monday June 29, 2009." (Id.)

The Hotel states that based on Dr. Lopez' deposition testimony, it determined that it "could not, responsibly, reinstate Plaintiff without putting the safety and lives of its other employees impermissibly at risk" and that therefore, the Hotel decided to terminate Serrano's employment "after carefully evaluating the situation." (Def.'s SUMF  ¶ 57-58 & Ex. 30.)  Serrano avers that starting from May through September 2009, he repeatedly requested to be reinstated to his position and asked about his employment status on a weekly basis to no avail.  He alleges that Alvarez, both before and after the deposition, informed Serrano that he was most certainly going to be terminated due to the fact that he was old and had complained. (Pl.'s SUMF, ¶¶ 57-58 & Ex.

1 ¶ 24.)  When Serrano requested his termination documents, Alvarez purportedly told him he would not give him anything. (Id.)  After repeated but failed demands by Serrano and his counsel for his reinstatement and/or for an update on his employment status, the Court instructed the Hotel to inform him of his employment status by Friday, September 18. (See Docket No. 40.)  The Hotel complied, and on said date, it terminated his employment. (See Docket No. 38 & Def.'s SUMF, Ex. 30.)

### III. Discussion

#### A. Evidentiary Issue

At the outset, the Court notes that many of the facts presented by Plaintiff in disputing the Defendant's facts are introduced by way of affidavit containing Plaintiff's unsworn statements made under penalty of perjury.  The First Circuit has held that a party can rely on a self-serving affidavit to oppose a motion for summary judgment if it contains relevant and specific factual information based on personal knowledge. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000); see, e.g., Rivera-Santiago v. Abbott Pharmaceutical PR LTD, 609 F. Supp. 2d 167, 174 (D.P.R. 2009) (applying the holding of Santiago-Ramos to find that ADEA plaintiff's affidavit recounting supervisors' discriminatory comments was admissible and competent to oppose the entry of summary judgment).  On the other hand, a party cannot rely on the affidavit if it merely reiterates allegations made in the complaint without providing specific factual information on the basis of personal knowledge.  Id.

The Court finds that Plaintiff's affidavit (Pl.'s SUMF, Ex. 1) is a competent source of evidence to oppose the Motion for Summary Judgment. This is so even though the statements made therein may eventually be found to be untrue after careful weighing of the evidence, which is a task for the jury, not the judge. Plaintiff, under penalty of perjury, described with particularity and from first-hand knowledge the Hotel's allegedly discriminatory conduct and his supervisors' allegedly discriminatory remarks. Plaintiff did not merely reiterate allegations made in the Complaint, but affirmatively provided specific factual information on the basis of personal knowledge. There is also no reason to suggest that Plaintiff filed a "sham affidavit" in order to survive summary judgment, as Plaintiff's facts are consistent and corroborated by other deposition testimony he presented. See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.")

**B. ADEA Discrimination Claim**

The ADEA makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 446 (1st Cir. 2009) (quoting 29 U.S.C. § 623(a)(1)). The Supreme Court recently clarified that, regardless of whether direct or circumstantial evidence is used to support an ADEA claim, and of whether a burden-shifting analysis is employed by the court, plaintiffs must "establish that age was the 'but-for' cause of the employer's adverse action." See Gross

v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2351 (2009). The Court declared in
Gross that this "but-for" standard is a much higher standard than that which has
been applied in Title VII cases. Id.

There is no "heightened evidentiary requirement" for plaintiffs to satisfy
their burden of persuasion through "direct evidence" as opposed to
"circumstantial evidence." Id. at 2351 n. 4. The rule is simply that "[a]
plaintiff must prove by a preponderance of the evidence (which may be direct or
circumstantial), that age was the 'but-for' cause of the challenged employer
decision." Id. at 2351 (citing Reeves v. Sanderson Plumbing Products, Inc., 530
U.S. 133, 141-143, 147 (2000)); see, e.g., Baker v. Silver Oak Senior Living
Management Co., 581 F.3d 684, 688 (8th Cir. 2009) (post-Gross Court of Appeals
case utilizing direct evidence to preclude entry of summary judgment); see also
Geiger v. Tower Automotive, 579 F.3d 614, 620-21 (6th Cir. 2009) (post-Gross
Court of Appeals case explaining direct evidence analysis at length)).

In the absence of direct or "smoking gun" evidence, ADEA plaintiffs may
nonetheless prove their cases by using the three-stage burden-shifting framework
set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973).[2] See Thermo King, 585 F.3d at 446-47. The first stage of the McDonnell
Douglas framework requires a plaintiff to establish a prima facie case of
employment discrimination, which requires a showing that the plaintiff-employee:
(1) was at least forty (40) years old at the time of the adverse employment
action complained of; (2) his job performance met or exceeded the employer's
legitimate expectations; (3) that his employer actually or constructively

_____

[2] In Thermo King, the First Circuit observed by way of footnote that the Supreme Court
had not definitively decided whether the McDonnell Douglas evidentiary framework utilized
in Title VII cases is appropriate in the ADEA context. Thermo King, 585 F.3d at 447 n.2.
The court noted, however, that the First Circuit has long applied the McDonnell Douglas
framework to ADEA cases, citing numerous First Circuit and other circuit court cases that
apply this analytical framework. Id. As this Court is bound by First Circuit case law, the
McDonnell Douglas framework will be utilized until the Supreme Court and the First Circuit
say otherwise.

discharged him [or subjected him to other adverse employment actions]; and (4) that his employer had a continuing need for the services he had been performing. See Torrech-Hernandez v. General Elec. Co., 519 F.3d 41, 48 (1st Cir. 2008). The prima facie showing requirement is a modest and low standard. Thermo King, 585 F.3d at 447. "A plaintiff who makes the prima facie showing is entitled to a presumption of age-based discrimination." Id.

As the First Circuit set forth in Thermo King, once the plaintiff establishes a prima facie showing of age-based discrimination, the Court proceeds as follows:

> The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for its decisions. If the employer articulates such a reason, the McDonnell Douglas framework - with its presumptions and burdens - is no longer relevant. At this stage, the sole remaining issue is discrimination *vel non*. A plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Ultimately, the plaintiff's burden is to prove that age was the but-for cause of the employer's adverse action.

Id. at 447-48 (internal quotation marks and citations omitted). Finally, for purposes of the dispositive motion before the Court, "[t]he ultimate question on summary judgment in [an] ADEA case is whether or not the plaintiff has adduced *minimally sufficient* evidence to permit a reasonable factfinder to conclude that he was fired [or subjected to an adverse employment action] because of his age." See id. at 452 (internal quotation marks and citations omitted). "Evidence establishing a prima facie case, in combination with evidence of pretext, can be sufficient to defeat summary judgment if a rational factfinder could conclude that unlawful age discrimination was the actual, but-for cause of the discrimination." Id. (citations omitted).

While the statement of law above employs language that appears to refer primarily to a discharge claim, an adverse employment action "need not rise to a level of a discharge to be actionable." Acevedo Martinez v. Coatings Inc. and

Co., 251 F. Supp. 2d 1058, 1068 (D.P.R. 2003) (citing Nelson v. University of Maine System, 923 F. Supp. 275, 281 (D. Maine 1996)). "It must, however, at a minimum, impair or potentially impair the plaintiff's employment in some cognizable manner." Nelson, 923 F. Supp. 2d at 281 (noting that demotion, failure to promote, suspension, as well as denial of benefits may also constitute adverse employment actions); see also White v. New Hampshire Dept. of Corrections, 221 F.3d 254, 262 (1st Cir. 2000) ("Adverse employment actions include demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees") (internal quotation marks omitted)). Relevant to this case, "withholding of salaries and bonuses could [also] be considered an adverse employment action." Rivera-Santiago v. Abbott Pharmaceutical PR Ltd, 609 F. Supp. 2d 167, 176 (D.P.R. 2009) (citing Sepulveda v. Glickman, 167 F. Supp. 2d 186, 193 (D.P.R. 2001)). Generally, as expressed by the Supreme Court, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

Finally, the Court must be mindful that its role is not to "second-guess the business decisions of an employer, nor to impose [its] subjective judgments of which person would best fulfill the responsibilities of a certain job." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990). "Courts may not sit as super personnel departments, assessing the merits - or even the rationality - of employers' nondiscriminatory business decisions." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991).

### 1. Direct Evidence of Age Discrimination

Although Plaintiff never really briefed the issue and instead argued his case under the familiar <u>McDonnell Douglas</u> burden-shifting framework, the Court nevertheless finds that Plaintiff has presented sufficient direct evidence of age discrimination to successfully oppose summary judgment.[3]  "Although its exact contours remain somewhat murky, the term 'direct evidence' normally contemplates only those statements by a decisionmaker that directly reflect the alleged animus and *bear squarely on the contested employment decision*." <u>Vesprini v. Shaw Contract Flooring Services, Inc.</u>, 315 F.3d 37, 41 (1st Cir. 2002) (internal quotation marks omitted) (emphasis in original); <u>see, e.g.</u>, <u>Rivera-Santiago</u>, 609 F. Supp. 2d at 174 (pre-<u>Gross</u> district court case utilizing direct evidence).  Usually, there must be a temporal proximity between the statements and the subsequent decisionmaking for the direct evidence to properly establish a causal nexus between the remarks and the adverse employment action. <u>See</u> <u>id.</u> at 42 n. 5.  The comments must also unambiguously display age-based animus and cannot be susceptible to an entirely benign connotation, as "inherently ambiguous assertions normally do not constitute 'direct evidence' of an age-based animus." <u>See</u> <u>id.</u> at 42.  Finally, "comments by non-decisionmakers . . . normally are not 'direct evidence' of age-based animus." <u>Id.</u> (<u>citing</u> <u>Melendez-Arroyo v. Cutler-Hammer de P.R. Co.</u>, 273 F.3d 30, 35 (1st Cir. 2001)).  And, "stray workplace remarks . . . normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." <u>Gonzalez v.</u>

---

[3] Plaintiff briefly stated, in closing, that: "In the present case Serrano has not only established all the elements of a prima facie case, demonstrating also that defendant's alleged reason for his discharge is pretextual and false, but has established, through *direct evidence*, that there is a genuine controversy of material and key facts, which makes it impossible for this Honorable Court to grant defendant's motion for summary judgment." (Pl.'s Opp. Mot. Summ. J. 33-34.) (emphasis added).  Plaintiff, however, never developed his ADEA claims by using direct evidence comporting with relevant case law and with Justice Thomas' <u>Gross</u> Opinion.  The Court, therefore, also addresses the parties' arguments as they were articulated under the <u>McDonnell Douglas</u> burden-shifting framework *infra*.

El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002); see also Ortiz-Rivera v. Astra

Zeneca LP, 596 F. Supp. 2d 231, 246 (D.P.R. 2009)).[4]

Plaintiff's Opposition to Defendant's Motion for Summary Judgment and its

accompanying statement of facts attribute numerous discriminatory remarks

bearing squarely upon contested employment decisions to relevant decisionmakers

in this case.  The factual allegations set forth in preceding sections of this

Opinion describe a work environment permeated by discriminatory remarks offered

by Serrano's supervisors - Jose Fas, Max Bonnemain, Leonides Nieves, and

Madeleine Burgos - as well as by the Hotel's director of human resources - Luis

Alvarez.  The discriminatory remarks referring derogatorily to Serrano's age,

fleshed out at length in the Court's factual exposition, need not be repeated.

However, by way of example, the Court highlights those statements bearing upon

employment decisions, such as when:

> (1) Fas and Bonnemain told Serrano that he would not be promoted because
> he was too old and wanted younger employees for supervisory and managerial
> positions;
> (2) Fas told Serrano's bar runner not to provide him with any equipment
> because he was an "old asshole;"
> (3) Fas told a housekeeper not to give Serrano, that "old guy" or "old
> ass...[,]" any food despite not having a meal break;
> (4) Alvarez told Serrano that he was putting himself through ridicule for
> complaining about his supervisors' discrimination at his age; and
> (5) Alvarez told Serrano, during a meeting about his deposition on April
> 30, 2009, that he would be terminated because he was an "old asshole" and
> had made threatening statements in the deposition.

The Court is faced with a factual scenario outlining direct evidence of

discrimination in the form of discriminatory statements by decisionmakers, such

as Plaintiff's supervisors and the director of human resources, who had the

power to alter the terms and conditions of Plaintiff's employment.  Within a

---

[4] While previously direct evidence would have enabled Plaintiff to pursue his ADEA
claims under a "mixed-motive" theory of discrimination, shifting the burden of persuasion
to the employer to demonstrate it would have acted the same way had it not been motivated
by age, the Supreme Court's Gross decision made it clear that ADEA plaintiffs always hold
the ultimate burden of persuasion to prove that they were discriminated against but-for
their age.

proximate amount of time after the statements were made, Plaintiff did suffer adverse employment actions like inferior working conditions and ultimately termination.  The statements were unambiguously discriminatory and were not stray remarks, but were rather continuous and persistent.  The discriminatory remarks could prove by a preponderance of the evidence that Plaintiff suffered numerous adverse employment decisions but for his age.  Furthermore, the remarks originated not only in Plaintiff's self-serving affidavit containing his unsworn statement under penalty of perjury, but also in three co-workers' deposition testimony, notably Sonia Figueroa Sanchez, Richard Fry Lopez, and Angel Soto Velez.  While, as Defendant points out, these co-workers are not themselves decisionmakers, they corroborated evidence of discriminatory remarks made *by* the decisionmakers in this case.

    With respect to Plaintiff's discharge, Alvarez' alleged statement that Serrano would be terminated because he was an "old asshole" on April 30, 2009, combined with evidence that his psychiatrist certified to the Hotel's human resources department on June 22 that Serrano was stable and should return to work, cast significant doubt on whether the Hotel's proffered legitimate reasons for his termination on September 18 - provided after Court Order requiring the Hotel to inform Serrano of his employment status - were in fact pretextual. While it is true that Serrano's threatening statements made on the record provide compelling and justifiable reason to discharge him under ordinary circumstances, here the Court finds mitigating circumstances that contextualize those statements, lessening their harsh effect when read in isolation for their literal sense, and that contradict or expose inconsistencies in the Hotel's proffered reasons.  Although the Court discusses the pretext inquiry at greater length *infra*, it suffices to say that the Court must credit the nonmovant's facts for making out direct evidence of age discrimination with sufficient detail, that when viewed in the most favorable light to Plaintiff, could prove

by a preponderance of the evidence that he was discriminated against but for his age.  At the very least, Plaintiff creates a genuine issue of material fact regarding whether he suffered adverse employment actions, including his termination, because of his age.  Whether or not to believe Plaintiff or his co-workers' factual account of the discriminatory remarks involves quintessential jury functions like weighing of the evidence and judging the credibility of witnesses.

The abovementioned remarks are sufficiently probative to constitute direct evidence of age-based animus on the part of the Hotel and to comport with Gross's but-for causation analysis, and are therefore adequate grounds for denying Defendant's Motion for Summary Judgment.  However, because the parties did not brief this aspect of ADEA law, still evolving and largely undeveloped post-Gross, the Court proceeds to address the parties' arguments under the McDonnell-Douglas burden-shifting framework.  As will be shown, while the analytical principles may be different, the result remains the same.

## 2. Circumstantial Evidence of Age Discrimination

### (a) Prima Facie Discrimination Case

Defendant argues that "any and all adverse employment actions taken against him were due to *bona fide*, non-discriminatory reasons." (Def.'s Mot. Summ. J. 9.)  The stated reasons are that Plaintiff has displayed violent and threatening behavior toward the Hotel's guests and employees, including threats to kill former and current supervisors.  Defendant's main argument in support of its Motion for Summary Judgment assumes that Plaintiff has proffered sufficient competent evidence to establish a prima facie case.  For, it never contests any of the four elements of an ADEA prima facie case and proceeds by

Civil No. 08-1797(PG)                                                      Page 22

laying out its burden of production as well as its denial of any pretext for its
adverse employment decisions.

     The Court agrees that Plaintiff has established a prima facie case of age
discrimination and notes that this initial evidentiary burden is a low one.
First, Serrano was over forty (40) years old during the 2007-2009 period of time
encompassing his allegations of discrimination, including his termination.
Second, Serrano was qualified for the position, as evidenced in a positive
evaluation for 2007, the last year he was evaluated, as well as in the numerous
performance-based awards, and despite a not-so-perfect employment history.
Third, he was subject to numerous adverse employment actions, including:
suspension; reassignment to less profitable bars; adverse changes to work
schedules and physical conditions; denial or reduction of pay increases; and
termination.  Finally, the Court presumes that the Hotel, a large resort with
numerous bars and restaurants, hired other bartenders after Serrano was
terminated, demonstrating its continued need for the same services and skills,
especially since Defendant does not refute Plaintiff's assertion that he met
this fourth prong.[5]   Having established a prima facie case of age
discrimination, Plaintiff is entitled to a presumption of age discrimination,
and the burden of production shifts to the employer to articulate a legitimate,
nondiscriminatory reason for its decisions.


     **(b) Burden of Production**

---

     [5]  In any case, if there is any doubt about whether Plaintiff proved his prima facie
case, when the employer has asserted a legitimate nondiscriminatory reason for its adverse
employment action, as the Hotel did here, the Court can assume without deciding that the
plaintiff has made a prima facie showing in order to address pretext and the ultimate
question of discrimination *vel non*. See, e.g., Hillstrom v. Best Western TLC Hotel, 354 F.3d
27, 31 (1st Cir. 2003); see also Ortiz-Rivera v. Astra Zeneca LP, 596 F. Supp. 2d 231, 242
(D.P.R. 2009) (citing numerous First Circuit cases in which the court bypassed the prima
facie inquiry where the employer had asserted a legitimate nondiscriminatory reason for its
adverse employment action).

Defendant has easily met its "minimal" burden of production to articulate a legitimate, nondiscriminatory basis for its discharge and preceding adverse employment decisions.  See Torrech-Hernandez, 519 F.3d at 48 ("The employer's burden is minimal - it need do no more than articulate a reason which, on its face, would justify a conclusion that the plaintiff was let go for a nondiscriminatory motive.") As Defendant articulated in its Motion for Summary Judgment:

> [E]l Conquistador has met its burden of production by identifying a nondiscriminatory basis for any and all adverse employment actions taken against Plaintiff Serrano, to wit, first, that he was involved in a violent incident with Hotel guests, he later incurred in insubordination against his supervisor, and finally, the fact that he repeatedly engaged in violent and threatening behavior (including death threats) towards the Hotel's employees, making them fear for their safety.

(Def.'s Mot. Summ. J. 14.)  It is undisputed that Plaintiff has suffered from emotional and psychological instability.  It is also undisputed that, regardless of whether or not the Hotel's discrimination caused the instability, he made threatening statements on the record in which he expressed past thoughts about wanting to kill himself and his supervisors. (See Def.'s SUMF, Ex. 4 at 274-75.) Defendant was clearly entitled to take these statements seriously and to act upon them, as protecting its employees' safety and health is a legitimate business as well as liability reason to remove a known threat from the workplace.  Indeed, Defendant supports his burden of production by citing cases that stand for proposition that federal antidiscrimination statutes cannot sensibly require an employer to retain an employee whose unacceptable behavior threatens the safety of others.  See, e.g., Calef v. Gillette Co., 322 F.3d 75, 86 (1st Cir. 2003) (Americans with Disabilities Act (ADA) case holding that the ADA does not require an employer to retain a threatening employee even if the behavior stems from a mental disability).  Whether Plaintiff's threats were in actuality serious enough to warrant discharge, or whether Defendant used a

troubled man's temporary moment of despair as pretext for what was in fact age discrimination, are separate questions addressed next.

### (c) Pretext and Discrimination *Vel Non*

At the third stage of the analysis, the Court must assess whether Plaintiff has raised a genuine issue of material fact about whether Defendant's stated reasons are a pretext for age-based discrimination.  The crucial question the Court must answer is whether upon examination of the evidence, it can reasonably support a finding that the employer practiced age-based discrimination against Serrano.  The Court finds several aspects of the evidence that, taken together, are more than sufficient to support a factfinder's conclusion that the Hotel discriminated against Plaintiff on the basis of age, and which thus raises a genuine issue of material fact that defeats summary judgment.  These include:

> (1) Persistent and harassing discriminatory remarks by his supervisors and other decisionmakers, such as age-related insults and name-calling - aside from those bearing directly on employment decisions previously discussed above;
> (2) the disparate treatment of Serrano in the terms and conditions of his employment vis-a-vis younger bartenders, for example, in working hours and conditions, opportunities for advancement, and reduced wages and bonuses;
> (3) the lack of documentary evidence by the Hotel to refute Serrano's disparate treatment claims, for example, business records showing that he received the same raises as other bartenders or that he was assigned to bars based on legitimate business goals and not age;
> (4) the lack of documentation evaluating the threat that Serrano posed to other co-workers at the time of his termination, especially in light of his psychiatrist's June 22, 2009 letter certifying that he no longer posed a threat to his work area and recommending that he be returned to his work duties; and
> (5) the span of time that passed between Serrano's threatening deposition statements on April 28, 2009, the supposed catalyst for the Hotel's discharge, and his termination on September 18, 2009, provided after an indefinite suspension and Court Order to inform him of his employment status.

Defendant focused its arguments on the threatening nature of Plaintiff's expression of violent thoughts toward his superiors, supported by his

psychiatrists' opinion that the threats should be taken seriously.  Defendant did not, however, explain how Plaintiff's threatening behavior justified taking adverse employment actions, such as unfavorable work shifts and salary reductions, prior to Plaintiff's outburst.  Neither did Defendant explain why it waited until almost four months after the outburst to officially terminate Plaintiff; nor why it had not provided Plaintiff with a definitive answer regarding his employment status until the Court ordered it to do so; nor why it ignored or at least failed to address his psychiatrist's certification of good health and recommendation that he be returned to work.  If Defendant had deemed Plaintiff's threatening behavior sufficiently serious to warrant discharge, then why did it lag in acting upon it and why did it have to wait until a Court Order to notify Plaintiff?  While the Court does not sit as a super personnel department, assessing the merits of the Hotel's nondiscriminatory business decisions, these gaps in Defendant's facts cast a shadow of doubt over Defendant's proffered reasons to an extent that raises a triable issue of fact over whether they were truly nondiscriminatory and not otherwise pretextual.

   While Defendant's stated reasons are compelling, Plaintiff has sufficiently placed undisputed evidence in the record or at least controverted Defendant's facts in a manner that raises a genuine issue of material fact regarding whether Plaintiff was subjected to adverse employment actions, including his termination, because of his age. As the First Circuit has observed, a plaintiff "can also establish pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (internal quotation marks and citations omitted).  There are significant weaknesses and inconsistencies

in the evidentiary record that undermine the Defendant's proffered legitimate nondiscriminatory reasons, compelling as they may be.

Moreover, because numerous material facts are disputed and require the weighing of evidence, as well as credibility findings, the Court must allow Plaintiff's discrimination claims to go forward to the jury. A key fact in controversy that is ripe for a jury determination, to provide one example, is whether to believe the Hotel supervisors that Serrano actually physically threatened one of them, Madeleine Burgos, in an act of insubordination, or to believe Serrano that they actually physically threatened him, which would undermine the Hotel's claims that Serrano was the one threatening other employees, or its claims that the threats were real and not merely excited utterances. In any case, under either a direct evidence or a circumstantial evidence burden-shifting framework, summary judgment is not proper when so many key material facts are in controversy.

## C. ADEA Hostile Work Environment Claim

Plaintiff pleads a hostile work environment claim under the ADEA. A hostile work environment claim is considered an adverse employment action but is analyzed under a different rubric and therefore is treated separately from the other employment actions discussed above. The First Circuit, recognizing hostile work environment claims under the ADEA, see Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008), has held that plaintiffs must show that: (1) they are a member of a protected class; (2) they were subjected to unwelcome harassment; (3) the harassment was based on age; (4) the harassment was sufficiently pervasive or severe so as to alter the conditions of Plaintiff's employment and create an abusive work environment; (5) the objectionable conduct was both objectively and subjectively offensive such that a reasonable person

would find it hostile or abusive and that the plaintiff did in fact perceive it to be so; and (6) some basis for employer liability has been established. See O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001).

The Supreme Court in Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), noted that the test for proving a hostile work environment "is not, and by its nature cannot be . . . mathematically precise." Harris, 510 U.S. at 22. A court, determining whether an environment is sufficiently hostile or abusive, must examine the totality of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not create a hostile work environment. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). The Court's function is one of screening to determine whether, on particular facts, a reasonable jury could reach such a conclusion. Noviello v. City of Boston, 398 F.3d 76, 94 (1st Cir. 2005).

The age-related derogatory comments set forth by Plaintiff and supported by his co-workers' deposition testimony, detailed in preceding sections of this Opinion, bear no repetition. Plaintiff was a member of the protected class in 2007, when his allegations of verbal and physical harassment began. Plaintiff presented sufficient evidence to show that he may have been subjected to unwelcome harassment, which was sufficiently pervasive and severe as to create an abusive work environment. Plaintiff alleged, for example, that his supervisors regularly harassed him with ageist insults; that they assigned him to inferior working conditions detrimental to his health, particularly his herniated disc condition; and that they said his job was not for old men and that if he could not take the abusive working conditions he could leave. His co-workers also stated in their depositions, for example, that his supervisors

regularly harassed him with ageist remarks; that they did not provide him with essential materials and equipment; and that they did not give him meal times or allow others to bring him food during his work shift.   Such objectionable conduct was subjectively offensive to the extent that Plaintiff alleges he was psychologically affected by it.   It was also objectively offensive, as Plaintiff's bar runner, Soto, testified that upon witnessing such abusive conduct, he was himself psychologically affected by it.   Based upon these allegations, which are supported by Plaintiff and his co-workers' testimony, the Court finds that Plaintiff has created an issue of material fact as to whether he was subjected to a hostile work environment on account of age-based discrimination.

### D. ADEA Retaliation Claim

Plaintiff also makes a retaliation claim under the ADEA, alleging that many of the adverse employment actions taken against him were done in retaliation for Plaintiff's filing a discrimination charge with the EEOC, as well as for filing his Complaint and testifying in this case.  "In addition to prohibiting age discrimination, the ADEA also protects individuals who invoke the statute's protections." Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc., 425 F.3d 67, 84 (1st Cir. 2005) (citing 29 U.S.C. § 623 (d)) ("It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.") Where there is no direct evidence of retaliation, the plaintiff may proceed to establish a prima facie case that closely tracks the McDonnell Douglas framework: the plaintiff must show that (1) he engaged in ADEA-protected

conduct, (2) he was thereafter subjected to an adverse employment action, and (3) a causal connection existed between the protected conduct and adverse action. Id.; see also Bennet v. Saint-Gobian Corp., 507 F.3d 23, 32 (1st Cir. 2007) (noting that at a bare minimum, this requires an employee to make a "colorable showing of a causal connection" between his protected activity and the adverse employment action).

Plaintiff is able to support the contention that he was subjected to adverse employment actions in direct response to the discrimination charge he filed with the EEOC, the filing of his Complaint, and his deposition testimony. Using direct evidence as an example, Plaintiff alleges that his supervisors on numerous occasions made retaliatory comments that he would be terminated due to the discrimination charge and the Complaint filed against the Hotel and also due to the deposition testimony describing his supervisors' discriminatory actions, all of which is protected conduct under the ADEA. (See Pl.'s SUMF, ¶¶ 44-52.) Using circumstantial evidence as an example, Plaintiff alleges that after he filed the discrimination charge on December 19, 2007, the Hotel changed his working shift from one starting at 5:00 p.m. to one starting at 9:00 p.m. and later 10:00 p.m., shifts that ended at 2:00 a.m. and 3:00 a.m. Plaintiff's co-worker, waitress Sonia Figueroa Sanchez, corroborated that his working shift began at 10:00 p.m. even at times when the Hotel was full and Plaintiff was needed earlier at the bar. (See Pl.'s SUMF, Ex. 3 at 43.)

While Defendant may deny that it ever made such retaliatory comments, it is Serrano's word against his supervisors' word, and therefore it is an issue of witness credibility apt for jury determination. And, while Defendant may deny that it retaliated against Plaintiff by altering the terms and conditions of his employment, Plaintiff has successfully proved a prima facie case of retaliation by making a colorable showing that numerous adverse employment actions suffered (e.g. inferior working hours and physical conditions,

suspension, termination) came *after* his protected conduct with sufficient proximity in time to defeat summary judgment. See <u>Decaire v. Mukasey</u>, 530 F.3d 1, 19 (1st Cir. 2008) (holding that temporal proximity alone can be sufficient to establish prima facie case of retaliation); <u>see also</u> <u>Noviello v. City of Boston</u>, 398 F.3d 76, 86 (1st Cir. 2005) ("When harassment follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation.") With circumstantial evidence, the Court would then proceed under the same <u>McDonnell-Douglas</u> burden-shifting analysis discussed above, since Defendant proffered the same nondiscriminatory reasons for retaliation, and Plaintiff would still hold "the ultimate burden of persuasion" in proving that the employer's reason is a pretext for retaliatory discrimination. <u>Lopez-Mendez v. Lexmark Intern., Inc.</u>, 680 F. Supp. 2d 357, 379 (D.P.R. 2010). As discussed in the pretext inquiry *supra*, Plaintiff has created an issue of material fact surrounding whether Defendant's proffered reason for its retaliatory actions, Plaintiff's threatening behavior, is pretextual.


   **E. Puerto Rico Law Claims**


     In addition to his federal claims, Plaintiff pleads supplemental state law claims under Puerto Rico's anti-discrimination statute, Law 100, and its anti-retaliation statute, Law 115. Because the analysis is practically the same under both federal and Puerto Rico law, Plaintiff chose to develop his arguments under the federal standards and case law. The Court agrees that the analytical principles are substantially the same and in the interest of judicial efficiency, does not analyze the claims separately under Puerto Rico law.

Summary judgment, therefore, is also denied for Plaintiff's local law claims under Law 100 and Law 115.[6]

## IV. Conclusion

The Court concludes by noting that this was a difficult case of age discrimination.  The parties' factual narratives were highly disputed, on many occasions almost diametrically opposed, and the Defendant provided a compelling justification for Plaintiff's termination based on his admittedly disturbing violent thoughts made on the record.  However, because the Court views the facts in the light most favorable to Plaintiff and he has raised a genuine factual controversy over whether Defendant practiced age-based discrimination, the Court must **DENY** Defendant's Motion for Summary Judgment on all of Plaintiff's federal and supplemental Puerto Rico law claims.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, May 13, 2010.

S/ JUAN M. PÉREZ-GIMÉNEZ
JUAN M. PÉREZ-GIMÉNEZ
UNITED STATES DISTRICT JUDGE

---

[6] The First Circuit has held that "on the merits, age discrimination claims asserted under the ADEA and under Law 100 are coterminous." Davila v. Corp. de P.R. Para la Difusion Publica, 498 F.3d 9, 18 (1st Cir. 2007). Furthermore, "[t]he evidentiary mechanism provided by Law 115 mirrors the McDonnell Douglas framework which we already addressed. . . ." Rivera Rodriguez v. Sears Roebuck de Puerto Rico, Inc., 367 F. Supp. 2d 216, 230 (D.P.R. 2005). See generally, Rivera-Rodriguez v. Sears Roebuck de Puerto Rico, Inc., 432 F.3d 379, 383 n. 2 (1st Cir. 2005) (affirming the dismissal of Plaintiff's claims under Law 100 and Law 115 for the same reasons as their federal ADEA counterparts).